[Cite as *In re N.C.W.*, 2014-Ohio-3381.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| N.C.W. | : | CASE NO. CA2013-12-229 |
| | : | O P I N I O N<br>8/4/2014 |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JS2010-1332

M. Lynn Lampe, 1248 Nilles Road, Suite 7, Fairfield, Ohio 45014, for appellant, B.W.

Jacqueline M. Handorf-Rugani, 5740 Gateway Blvd., Suite 202, Mason, Ohio 45040, for appellees, M.N. and C.N.

Andrew P. Meier, 140 North Main Street, Suite B, Springboro, Ohio 45066, for A.N.

**PIPER, J.**

{¶ 1} Appellant-Mother (Mother), appeals a decision of the Butler County Court of Common Pleas, Juvenile Division, overruling her motion to terminate the visitation rights of her child's paternal grandparents (Grandmother and Grandfather or Grandparents).

{¶ 2} Mother had a child with Grandparents' son (Father). Mother and Father never married, and Father initiated parenting proceedings within the Butler County Juvenile Court

(trial court) to establish paternity. While paternity was established, Father was never granted visitation rights with the child because of his history of mental illness, which included multiple institutionalizations. Father's mental illness manifests itself in various ways, such as carving satanic symbols into his body and then sending Mother a picture of the carvings through her cell phone.

{¶ 3} In January 2012, Grandparents filed a motion for visitation rights with the child based upon R.C. 3109.12, which permits relatives of a child born to an unwed mother to seek visitation with that child. In March 2012, Mother and Grandparents entered into an agreed entry that set forth a schedule for Grandparents to visit with the child. Mother agreed to the visitation after Grandparents assured her that Father would not have contact with the child. Within a week of agreeing to visitation between the child and Grandparents, Mother filed a Domestic Violence Civil Protection Order (CPO) in the Butler County Domestic Relations Court when Father threatened to kill both her and the child. The CPO was granted and was in effect to protect Mother and the child from Father and his death threats.

{¶ 4} Mother and Father later entered into a domestic violence consent agreement, which was adopted in the trial court. However, Father violated that consent agreement when he left Grandparents' residence where he had been staying, and broke into Mother's home when she and the child were there. Mother tried to call the police, but Father threatened her and would not leave until Mother convinced Father that she would not call the police. Mother then filed a contempt motion against Father, and Father stipulated to a contempt finding. Because of Father's breaking into her home, Mother entered into a second CPO in January 2013. Father also began texting, stalking, and harassing Mother, including sending her photographs of the satanic symbols he had carved into his body. However, Mother did not try to terminate visitation between Grandparents and the child because they assured her that Father would no longer be residing with them, and that Father would be placed in a mental

- 2 -

health institution in Florida.

{¶ 5} While the domestic violence issue was pending in the Domestic Relations Court, Grandparents filed at least two contempt motions in the trial court. One such motion moved the court to find Mother in contempt for not providing visitation pursuant to the March 2012 entry. Specifically, Grandparents contended that Mother was supposed to permit visitation every other Sunday, and argued that they were having their visitation on the *wrong* Sunday. Mother works every other Sunday, so that the court ordered Grandparents to have visitation with the child on alternating Sundays. However, Grandparents wanted visitation with the child on the day that Mother does not have to work to accommodate play tickets they had purchased. Grandparents dismissed their contempt motion on the day of the motion hearing.

{¶ 6} Grandparents later filed another contempt motion against Mother for not permitting the child to visit with Grandparents until they agreed not to bring the child around their cat. The child has several significant health concerns, including asthma and allergies, which require both constant medication and the child to carry an injectable epinephrine pen in case of emergency. These health ailments include Eosiniphilic Esophagitis, which is essentially a physical manifestation of the child's allergic reactions that results in the narrowing, scarring, and inflammation of the esophagus. The condition requires oral steroids and other medications, as well as several endoscopies per year in order to track the effects of the condition. The child is also prescribed inhaled steroids and a Nebulizer for asthma, and the child has severe allergies to foods (including peanuts, dairy, soy, wheat, fish, eggs, rye, mustard, and barley), animals (including cat and dog dander), and natural elements (such as tree and grass pollen).

{¶ 7} Mother asked Grandparents, who owned a cat, to have their visits with the child outside the presence of the cat, but Grandparents did not comply with the request. When

Grandparents continued to visit with the child around the cat for an additional two months after learning of the risk to the child's health, Mother refused a visit until Grandparents would assure her that they were taking action to have visitation outside the presence of the cat. Grandparents, instead of arranging visitation outside the home, required Mother to provide proof of the child's allergic reaction to cats, and then opted to remove the cat from their home once Mother provided a letter to Grandparents from the child's doctors regarding the child's severe allergy to cats. Mother offered to allow Grandparents to make up the visit, but Grandparents refused and instead filed a contempt motion against Mother. This motion was also dismissed prior to disposition.

{¶ 8} Mother provided Grandparents with extensive information about the child's multiple diagnoses, as well as copies of the child's medical records so that they could appreciate the severity of the medical conditions and allergy concerns. Mother also signed a release so that Grandparents could discuss the child's health matters with the child's doctors. Mother detailed the child's eating habits and other issues surrounding the medical conditions, such as the child's medications and breathing treatments. Instead of communicating openly with Mother about the child's conditions, Grandparents would turn their back on Mother as she tried to talk to them at visitation exchanges, and freely admit that they do not communicate with Mother unless it is through attorneys.

{¶ 9} During the time of the domestic violence issues with Father and Grandparents' contempt motions over visitation issues, Mother began to notice that the child's behavior was changing for the worse. For example, the child suffered from night terrors and was uncharacteristically fussy. During a visitation exchange, Mother asked Grandparents if Father was somehow having contact with the child, and whether Father was back residing with Grandparents. Grandmother answered that her son is the child's father and then moved toward Mother (who was holding the child at the time) with her hands raised in what Mother

believed was a threatening and intimidating manner. Grandmother had to be restrained and Mother's mother (the child's maternal grandmother) stepped in between Mother and Grandmother to ensure that Grandmother could not physically contact Mother or the child. When Mother would ask where Father was during the visits, Grandparents would either not answer Mother or tell her to talk to her attorney. Grandfather admitted to his belief that Mother does not need to know where Father is at the time of visitation because such information is "irrelevant."

{¶ 10} Given the child's change in behavior, coupled with Grandparents' unwillingness to inform Mother as to Father's whereabouts, Mother enlisted the services of a private investigator. During a visit between the child and Grandparents, Grandmother placed the child in her car and drove to an unknown location. The investigator followed Grandmother until Grandmother stopped. Unbeknownst to the investigator or Mother, Father had moved from Grandparents' residence into an apartment building that was within one block, and within sight, of where the investigator had followed Grandmother.

{¶ 11} Mother moved to terminate visitation between the child and Grandparents given (1) Father's threat to kill the child, (2) Father's dangerous behavior, (3) Mother's belief that Grandparents facilitate visitation between the child and Father despite the existence of the CPO, (4) Grandparents' lack of concern for the child's health issues, as well as (5) Grandparent's refusal to communicate with Mother about the child.

{¶ 12} The matter proceeded to a two-day hearing in front of a magistrate. During the hearing, Mother testified, and also called as witnesses her mother, the private investigator she hired, as well as Father and Grandmother, as if on cross-examination. However, neither Grandmother nor Father testified on direct examination, and only Grandfather testified in support of continued visitation. The magistrate issued an opinion that recognized Mother's concerns but denied Mother's request to terminate visitation. Mother filed objections to the

magistrate's order, which were later overruled by the trial court.  Mother now appeals the trial court's ruling, raising the following assignments of error, which we will discuss together as they are interrelated.

{¶ 13} Assignment of Error No. 1:

{¶ 14} THE TRIAL COURT ERRED TO [SIC] PREJUDICE OF MOTHER BY NOT AFFORDING MOTHER'S WISHES EXTREME DEFERENCE, ESPECIALLY WHEN NO COMPELLING GOVERNMENTAL INTEREST EXISTS TO OVERCOME THIS EXTREME DEFERENCE.

{¶ 15} Assignment of Error No. 2:

{¶ 16} THE TRIAL COURT'S DECISION NOT TO TERMINATE GRANDPARENT VISITATION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN THE EVIDENCE CLEARLY SHOWED THE GRANDPARENTS REFUSED TO COMMUNICATE WITH MOTHER, THE GRANDPARENTS WERE HOSTILE TOWARD MOTHER, AND THE GRANDPARENTS USED CONTEMPT MOTIONS AS A MEANS TO FINANCIALLY BREAK MOTHER.

{¶ 17} Mother argues in her two assignments of error that the trial court erred by not granting her motion to terminate Grandparents' visitation.

{¶ 18} It is undisputed that a parent has a fundamental right to raise her own child. As stated by the Ohio Supreme Court, "[t]he United States Supreme Court has stated that the right to raise one's children is an 'essential' and 'basic civil right.'  Parents have a 'fundamental liberty interest' in the care, custody, and management of the child.  Further, it has been deemed 'cardinal' that the custody, care and nurture of the child reside, first, in the parents." *Anderson v. Anderson*, 12th Dist. Warren No. CA2009-03-033, 2009-Ohio-5636, ¶ 16, citing *In re Murray*, 52 Ohio St.3d 155 (1990).

{¶ 19} Conversely, "the law does not provide grandparents with inherent legal rights

based simply on the family relationship." *In re H.W.*, 114 Ohio St.3d 65, 2007-Ohio-2879, ¶ 9. Further, the Ohio Supreme Court has recognized that grandparents' "legal rights may be limited." *Id.* A grandparents' "visitation privilege cannot reasonably be construed as an absolute or constitutionally protected 'right' of association." *In re Schmidt*, 25 Ohio St.3d 331, 336 (1986). The standards of legal review "are not different for reviewing a motion for termination of grandparents' visitation as they are for reviewing an original complaint for establishment of grandparents' visitation. In both cases, the parents' fundamental right of exclusive control over their child is at stake." *In re Kaiser*, 7th Dist. Columbiana No. 04 CO 9, 2004-Ohio-7208, ¶ 48.

{¶ 20} R.C. 3109.051(B) provides that a trial court may grant reasonable visitation rights to grandparents if the court determines that such visitation is in the child's best interests. The trial court has discretion as to visitation issues, and its decision will not be reversed absent an abuse of discretion, such that the decision is unreasonable, arbitrary or unconscionable. *In re S.K.G.*, 12th Dist. Clermont No. CA2008-11-105, 2009-Ohio-4673, ¶ 21. When determining whether to grant visitation rights to a grandparent, the trial court is required to consider the 16 factors listed in R.C. 3109.051(D).

> (1) The prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity, and with the person who requested companionship or visitation if that person is not a parent, sibling, or relative of the child;
>
> (2) The geographical location of the residence of each parent and the distance between those residences, and if the person is not a parent, the geographical location of that person's residence and the distance between that person's residence and the child's residence;
>
> (3) The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;

(4) The age of the child;

(5) The child's adjustment to home, school, and community;

(6) If the court has interviewed the child in chambers, pursuant to division (C) of this section, regarding the wishes and concerns of the child as to parenting time by the parent who is not the residential parent or companionship or visitation by the grandparent, relative, or other person who requested companionship or visitation, as to a specific parenting time or visitation schedule, or as to other parenting time or visitation matters, the wishes and concerns of the child, as expressed to the court;

(7) The health and safety of the child;

(8) The amount of time that will be available for the child to spend with siblings;

(9) The mental and physical health of all parties;

(10) Each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights, and with respect to a person who requested companionship or visitation, the willingness of that person to reschedule missed visitation;

(11) In relation to parenting time, whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child* * *;

(12) In relation to requested companionship or visitation by a person other than a parent, whether the person previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child * * *;

(13) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(14) Whether either parent has established a residence or is planning to establish a residence outside this state;

(15) In relation to requested companionship or visitation by a person other than a parent, the wishes and concerns of the child's parents, as expressed by them to the court;

(16) Any other factor in the best interest of the child.

**{¶ 21}** As especially pertinent to this case, and pursuant to the 15th factor, a trial court must consider "the wishes and concerns of the child's parents, as expressed by them to the court." R.C. 3109.051(D)(15). There is a presumption that "fit parents act in the best interests of their children." *Troxel v. Granville*, 530 U.S. 57, 68, 120 S.Ct. 2054 (2000). Accordingly, "a fit parent's decision regarding visitation should be afforded *great deference.*" (Emphasis added.) *Baker v. Baker,* 12th Dist. Brown No. CA2002-04-008, 2003-Ohio-731, ¶ 10. In other words, absent an allegation of parental unfitness, the parents' determination of their child's best interest must be afforded "*special weight.*" (Emphasis added.) *Troxel* at 69.[1] "'Special weight' has been described as 'extreme deference.'" *In re Kaiser*, 2004-Ohio-7208, ¶ 15, quoting *Oliver v. Feldner*, 149 Ohio App.3d 114, 2002-Ohio-3209, ¶ 59 (7th Dist.).

**{¶ 22}** In *Troxel*, the U.S. Supreme Court reviewed a Washington state nonparent visitation statute and found that the wishes of a parent who is considered a "fit" parent should be given "special weight" by the trial court and acknowledged that there is a traditional presumption that a fit parent acts in the best interests of his child. The Ohio Supreme Court adopted the *Troxel* court's reasoning in *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334. In *Harrold*, the court held that "Ohio courts are *obligated* to afford some special weight to the wishes of parents of minor children when considering petitions for nonparental visitation." (Emphasis added.) *Id.* at ¶ 12.

---

1. As discussed by the Seventh District Court of Appeals, the Due Process Clause of the Fourteenth Amendment protects a parent's fundamental right to make decisions concerning the care, custody, and control of their children. "Accordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Oliver v. Feldner*, 149 Ohio App.3d 114, 2002-Ohio-3209, ¶ 19 (7th Dist.).

{¶ 23} The *Harrold* Court specifically addressed Ohio's statutes that afford visitation rights to nonparents and held that such are constitutional in the face of a parent's fundamental right to parent his child. "The state has a compelling interest in protecting a child's best interest, * * * and Ohio's nonparental-visitation statutes are narrowly tailored to serve that compelling interest." 2005-Ohio-5334 at ¶ 44. While statutes granting visitation rights to nonparents have provided a means for grandparents to seek visitation rights, such was not always the case.

{¶ 24} Until codification of a nonparent's ability to seek visitation through the Ohio Revised Code, nonparents were not permitted to seek visitation rights. However, various statutes were promulgated by the legislature to give standing to nonparents when seeking visitation. These statutes include R.C. 3109.12, which permits relatives of a child born to an unwed mother to seek visitation with that child; R.C. 3109.11, which permits relatives of a minor child to seek visitation with that child when the child's parent has died; R.C. 3109.051(B)(1), which permits relatives to seek visitation with a child involved in a divorce, dissolution of marriage, legal separation, annulment, or a child support proceeding; and R.C. 3107.15(C), which permits a relative's visitation of an adopted child.

{¶ 25} Even though the statutes grant standing to a nonparent to request visitation, the ability to have visitation awarded is conditional upon a finding that visitation with the nonparent is in the best interest of the child. Given that a fit parent has a *fundamental right* to parent whereas the nonparent has only a statutory right to request visitation, the nonparent advocating visitation has the burden to prove that visitation will be in the child's best interest. *Harrold* at ¶ 45. Placing the burden on the nonparent, thereby, honors "the traditional presumption that a fit parent acts in the best interest of his or her child." *Id.*[2] *See also*

---

2. Grandparents state in their brief that it is "rudimentary that the moving party bears the burden of proof" and that when a parent seeks to modify a previous visitation arrangement, the party seeking the change has the

*Frazier v. Frazier*, 4th Dist. Hocking No. 02CA8, 2003-Ohio-1087, ¶ 26 (finding that the parent "is not required to prove that visitation is not in [the child's] best interest. Rather, [grandparents] must prove that such visitation is in the child's best interest").

{¶ 26} After reviewing the record, we find that the trial court abused its discretion by unduly placing the burden of proof on Mother during its balancing of the factors, and not affording Mother's wishes sufficient deference.

{¶ 27} First, and in regard to the burden of proof, the trial court adopted the magistrate's opinion in full. In that opinion, the court makes improper references to Mother's failure to demonstrate that the best interest factors weigh in her favor, or even that Mother has not presented *enough evidence* to substantiate her claims. For example, Mother presented evidence regarding the health and safety of the child and how such was impacted negatively by the disharmonious exchanges of the child for visitation. After reviewing some of the evidence, the court found that Mother "did not demonstrate how the child is being negatively affected by the exchanges." The court made this finding despite Mother's uncontested testimony that the child suffers from night terrors and had acted fussier than normal, and that such behavior did not occur prior to the visitation.

{¶ 28} The court also reviewed testimony and evidence that Grandparents were in favor of facilitating visitation between Father and the child, including circumstantial evidence that Grandmother took the child to Father's apartment building during a visit. The court noted that the CPO was in place and that Grandparents were aware of the order that Father not have contact with the child, a child he had threatened to kill. Even so, Grandmother

---

burden of proof. Grandparents cite *Pettry v. Pettry*, 20 Ohio App. 3d 350 (8th Dist.1984), and *Bodine v. Bodine*, 38 Ohio App.3d 173 (1988), in support of their proposition that Mother had the burden of proof. However, both of the cases cited involve parents, not grandparents, who have fundamental rights to parent. Grandparents do not have such a right and are treated inherently different than parents by the law. Whether the issue is the establishment or modification/termination of visitation rights, the fit parent's fundamental right to parent the child is at stake, and the only way to honor the constitutional rights and presumption that a parent acts in the child's best interest is to place the burden on the nonparent seeking continued visitation.

insinuated that Father has a right to see the child because Father is the child's father, and Grandfather testified at the hearing that he does not believe that Father would *actually* harm the child. Despite this evidence and testimony, the court held that "Mother did not produce sufficient evidence for this Court to conclude that Paternal Grandparents have assisted Father in violating that order by permitting contact." Such a finding, whether or not the trial court believed the evidence to be true, demonstrates that the trial court placed an unpermitted burden on Mother to prove that visitation is not in the child's best interest, rather than placing the burden correctly upon Grandparents.

{¶ 29} The court also noted that Mother had failed to provide proof that Grandparents were being inflexible with the child's visitation in light of the child's multiple medical appointments. Mother testified that Grandparents demonstrated a lack of flexibility in accommodating the child's medical appointments that occur during the week when Grandparents may be visiting with the child. Despite Mother's testimony, the court found that Mother did not provide examples of when this actually occurred, again intimating its belief that Mother had the burden to prove these issues.[3]

{¶ 30} In its balancing of the factors, the court noted that in some factors, "Paternal Grandparents and Mother bear similar fault such that neither side benefits from analysis of that factor." This statement, once again, demonstrates that the court was placing a need on Mother to prove that her concerns were valid in order to carry her burden to show that visitation was not in the best interests of the child. However, that burden belonged solely to Grandparents, and the trial court abused its discretion by impermissibly shifting that burden

---

3. During Mother's direct testimony, counsel asked Mother to describe ways that Grandparents were being inflexible and Mother stated, "there's therapy appointments that [the child] had recently that's had to cancel [sic] because of the visit…the visit times." While Mother may not have provided exact dates, Mother did answer that the inflexibility was specific to Grandparents not permitting the child to attend medical appointments because such coincided with their visitation. Mother further testified that instead of Grandparents working with her to amend visitation to account for the child's medical appointments, Grandparents chose to file contempt motions or to involve their attorneys.

to Mother. If Grandparents failed to carry their burden on a factor (or several factors) the court should have held that such factors *did not weigh in favor of continued visitation* with the child, rather than being a "wash" between Mother and Grandparents.

{¶ 31} In addition to the improper imputation of the burden of proof on Mother, we also find that the court abused its discretion by not affording Mother's wishes sufficient weight. It is undisputed that the court's written opinion makes reference to giving "special weight" to Mother's wishes, as well as an express finding that Mother is a fit parent. The court even stated that it was giving "elevated weight" to Mother's wishes. However, the court then found Mother's valid concerns insufficient to overcome what it considered were the other best interest factors favoring continued visitation without actually giving Mother's wishes the elevated weight the court said it would.

{¶ 32} The court found that Mother's concerns regarding Grandparents' continued visitation with the child were valid. In fact, the trial court noted that "this Court has recognizes [sic] that Mother has some legitimate concern regarding Paternal Grandparents having the ability to adequately protect this child, and she is entitled to be assured that they will enforce the no contact order."[4] The trial court did not dismiss Mother's concerns as baseless or otherwise not founded in reality.

{¶ 33} Despite the genuine and serious concerns that Mother had, concerns the trial court found to be "legitimate," the trial court dismissed such concerns in light of factors it determined weighed in favor of continued visitation. The trial court's written decision does not demonstrate, however, that the court weighed the balancing factors while giving sufficient weight to Mother's wishes. The trial court reviewed factor 15 regarding Mother's wishes and

---

4. The trial court ordered that Grandparents permit no contact between Father and the child, and then warned Grandparents that if they were to violate the order, they would face contempt of court. We cannot help but recognize how unsuitable a remedy a finding of contempt would be if the child is harmed, or worse, should Grandparents disobey the court's order.

found that "Mother requests that this Court terminate all contact between the child and Paternal Grandparents." The court then moved on without addressing specifically the reasons behind Mother's request and without addressing the evidentiary basis upon which Mother's valid concerns were based. Nor did the court recognize that Mother's wishes carry with it the presumption that she is acting in the best interest of her child by asking that visitation be terminated.

{¶ 34} Later in the trial court's decision, the court reiterated Mother's concern regarding Grandparents permitting contact between the child and Father, as well as Grandparents being unwilling to shield the child from Father given their belief that Father has a right to see the child and the belief that Father would never actually hurt the child. The court revisited the communication issues, and the lack of respect Grandparents have shown Mother during exchanges.

{¶ 35} In balancing these reasons as to why Mother wished to terminate Grandparents' visitation, the court found the following evidence sufficient to overcome Mother's wishes and all of the factors that weighed in favor of terminating visitation: Grandparents have visited with the child for a year, they have a close bond with the child, Grandparents do not engage in inappropriate activities with the child, the distance between residences is conducive to visitation, and the child is familiar with Grandparent's home and has toys there. While we have no issue with finding that this evidence is important to the decision and overall weighing of the factors, we find it unreasonable that the trial court did not weigh this limited basis for why visitation should continue more specifically against the fact that Mother wished to terminate visitation and that Mother was acting in the best interest of her child by requesting termination.

{¶ 36} We fully acknowledge that a fit parent's wishes to end visitation with a nonparent are not irrebuttable, as nothing in *Troxel* suggests that a parent's wishes should be

placed before a child's best interest. *See Rowell v. Smith*, 133 Ohio St.3d 288, 293, 2012-Ohio-4313. Even so, the well-established law is that a fit parent is presumed to act in the best interest of her child. The trial court's decision did not incorporate that presumption into its analysis of the factors, and impermissibly placed the burden on Mother to prove that visitation was not in the child's best interest. As such, Mother's assignments of error are sustained.

{¶ 37} The factors must be rebalanced, placing the proper burden of proof on Grandparents to establish that continued visitation is in the best interest of the child. The rebalancing of factors will not require any additional hearings or evidence, as both parties were presented with the opportunity to present their case. The remand is specific only to a rebalancing of the factors by the trial court based upon evidence already admitted.

{¶ 38} On remand, the trial court shall give proper weight to Mother's wishes, including the presumption that Mother is acting in the best interest of her child by requesting that visitation be terminated. The court shall properly place the burden of proof on Grandparents to demonstrate that the evidence they presented through Grandfather's testimony has proven that continued visitation with the child is in the child's best interest. In doing so, the court must remember that the analysis begins with a tipped scale due to the special weight and extreme deference to be given to Mother's wishes and safety concerns under the 15th factor set forth in R.C. 3109.051(D).

{¶ 39} The judgment of the trial court is reversed, and the issue is remanded for further proceedings consistent with this opinion.

S. POWELL, P.J., and M. POWELL, J., concur.